**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

DEAN MARCONI and FRANCO CASELLA,
Derivatively on Behalf of FUNKO, INC.

Plaintiff,

v.

ANDREW PERLMUTTER, JENNIFER FALL
JUNG, BRIAN MARIOTTI, STEVE NAVE,
CHARLES DENSON, DIANE IRVINE, SARAH
KIRSHBAUM LEVY, MICHAEL LUNSFORD,
JESSE JACOBS, RICHARD PAUL, TREVOR
EDWARDS, KEN BROTMAN, and ADAM
KRIGER,

Defendants,

and,

FUNKO, INC.,

Nominal Defendant.

Case No:

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Dean Marconi and Franco Casella ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Funko, Inc. ("Funko" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information

COMPLAINT - 1
No.  2:25-cv-00555

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of law that have caused substantial harm to the Company.

## JURISDICTION

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or

COMPLAINT - 2

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.      Plaintiff Dean Marconi ("Marconi") is, and was at relevant times, a shareholder of the Company.  Plaintiff Marconi will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

7.      Plaintiff Franco Casella ("Casella") is, and was at relevant times, a shareholder of the Company.  Plaintiff Casella will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

8.      *Nominal Defendant Funko* is incorporated under the laws of the State of Delaware and its principal executive offices are located in Everett, WA.  Funko's common stock trades on the NASDAQ under the ticker symbol "FNKO."

COMPLAINT - 3

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

**Director Defendants**

9.      **Defendant Andrew Perlmutter** ("Perlmutter") served as the Company's president through March 2024 and served on the Board of Directors through May 2024.

10.      **Defendant Brian Mariotti** ("Mariotti") served as Chief Executive Officer ("CEO") and director of Funko through September 2023.

11.      **Defendant Steve Nave** ("Nave") was at all relevant times a director of the Company.

12.      **Defendant Charles Denson** ("Denson") is, and was at all relevant times, a director of the Company.

13.      **Defendant Diane Irvine** ("Irvine") is, and was at all relevant times, a director of the Company.

14.      **Defendant Sarah Kirshbaum Levy** ("Levy") is, and was at all relevant times, a director of the Company.

15.      **Defendant Michael Lunsford** ("Lunsford") was at all relevant times a director of the Company.

16.      **Defendant Jesse Jacobs** ("Jacobs") is, and was at all relevant times, a director of the Company.

17.      **Defendant Richard Paul** ("Paul") was at all relevant times a director of the Company.

18.      **Defendant Trevor Edwards** ("Edwards") is, and was at all relevant times, a director of the Company.

19.      **Defendant Ken Brotman** ("Brotman") was at all relevant times a director of the Company.

COMPLAINT - 4

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

20.    **Defendant Adam Kriger** ("Kriger") was at all relevant times a director of the Company.

21.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

22.    **Defendant Jennifer Fall Jung** ("Fall Jung") served as the Company's Chief Financial Officer ("CFO") through February 2023.

23.    Defendants Perlmutter, Mariotti, and Fall Jung are collectively referred to herein as the "Officer Defendants."

24.    The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

25.    Funko's business is "built on the principle that almost everyone is a fan of something" – whether a TV show, movie, music, or sports team – and the Company designs, sources and distributes vinyl figures and other consumer products around that fandom with licensed content. Major Funko licensors included Disney, Marvel, HBO, LucasFilm, Netflix, Pokémon, the National Football League, NBCUniversal, Epic Games, Blizzard Entertainment, and Warner Bros.

26.    Funko divides its products into three categories. The first, which accounted for approximately 76% of the Company's sales during FY22, is Core Collectibles. Core Collectibles includes Funko's various pop culture figurine brands: its distinctive Pop! Vinyl figures, and newer collectible brands such as Soda, Vinyl Gold and Popsies.

COMPLAINT - 5

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

27.     The second category, Funko's Loungefly brand, consists of "softline" products – clothing, accessories, bags, wallets and plush toys – and represented 19% of Funko's net sales in 2022. The third category, simply called "Other," includes toys and games and digital content (NFTs), and accounted for approximately 5% of Funko's net sales in 2022.

28.     Funko's products are also divided into two categories based on whether they concern "evergreen" pop culture properties – licensed properties based on movies, TV shows, video games, music, sports, or other entertainment content not tied to a new or current release at the time Funko release a product – or "current release" properties – licensed properties based on new movies, current TV shows, or new video game titles. While the evergreen properties, such as Star Wars Classic, Harry Potter, certain DC Comics and Marvel characters, and WWE, do not have a defined duration of market demand, current release properties are intended to "capitalize on the excitement of fans surrounding the launch of new content" and have a limited duration of market demand depending on how popular the content ultimately proves. Accordingly, Funko is given visibility into the new release schedule of many of its license partners and content providers months ahead of time so that it can create new products to time with the release of the new content.

29.     Funko's sales are primarily made through mass-market retailers (*e.g.*, Target, Walmart, and Amazon) and large specialty retailers (*e.g.*, GameStop, Hot Topic, Barnes & Noble), with additional sales made to small or regional stores. Funko's direct-to-consumer, or "e-Commerce," sales also grew significantly, with the Company putting more priority on the high-margin segment and promoting exclusive Core Collectibles releases on the Funko website. There is also a thriving secondary market for Funko products among the Funko collector community (estimated to comprise about one-third of Funko customers) that takes place through websites like

COMPLAINT - 6

eBay and Facebook Marketplace, as well as through resale vendors at comic book conventions, *etc*.

**Funko's Limited Lifespan Products Made Inventory Control Imperative**

30.     Funko's extensive licensing portfolio is critical to its business model and by the end of 2021, Funko held over 900 active licenses for characters and other pop culture IP from content providers. These licenses typically allowed Funko to use the licensed content to design and manufacture Funko products based on the content for two-to-three year periods. In exchange, the licensor received royalty fees based on a percentage of the revenue earned from the Funko product using their IP. Because the license agreements also generally guaranteed minimum royalty payments to the licensor, Funko's revenue from the product needed to surpass the contracted minimum royalty payment in order for the Company to make a profit. License agreements also generally contained terms governing the minimum amount that Funko could charge for the products and what percentage of sales Funko would have to spend on marketing the product.

31.     Critically, the contracts also specified that the licensors owned the intellectual property rights in the products Funko designed and sold under the license, such that upon termination of those licenses, Funko no longer had the right to sell those products. Inventory that Funko was no longer allowed to sell due to license expirations or older inventory that could not be sold because of a lack of consumer demand was referred to internally as "dead" product.

32.     Funko's need to capitalize on pop culture events and trends, and its limited-life licensing agreements had several important implications for its business.

33.     First, to capitalize on its licenses and generally short-lived market demand for current release properties, it was essential that Funko be able to quickly design, manufacture and ship its products. Funko touted that its production model enabled it to "go from product design of

COMPLAINT - 7

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

a figure to the store shelf within 110 to 200 days . . . with a minimal upfront investment for most figures of $5,000 to $7,500 in tooling, molds and internal design costs." However, depending on the licensor and the terms of the license agreement, it could take months for a product design to be negotiated and approved between the licensor and Funko before it could be manufactured. This generally meant that Funko had approximately one year to sell its products before the inventory became "dead."

34.    Second, the limited sales-life of Funko's products heightened the importance of accurate demand forecasting and inventory management. Funko's products were both increasingly unlikely to sell the longer they sat on shelves, and at a certain point, unable to be sold at all. Unsellable inventory (or slow-moving inventory only sellable at a steep discount) not only cost the Company in terms of manufacturing and freight from its China or Vietnam factories to its distribution centers, but also because it had to be stored, occupying valuable warehouse space needed for new products. (Dead products were eventually sent to a landfill or recycled via a third-party disposal service.) Moreover, Funko based its financial projections in part on sales of those products; the lost revenue from undesirable product could cause the Company to miss financial targets it had established for Wall Street and investors.

35.    Funko experienced these exact problems in 2019, when it accumulated more than 10 to 12 million obsolete units of product in its Everett, Washington warehouses. The unsellable inventory clogged up its warehouses so badly that at one point, Funko had hundreds of shipping containers of new product it could not unload sitting in its parking lot and the Port of Seattle. Rather than get rid of the inventory, the Company eventually leased a new warehouse in Puyallup, Washington, to continue storing it. But that was simply putting a Band-Aid on a bullet hole, and on February 5, 2020, Funko publicly announced it needed to write down $16.8 million in inventory

COMPLAINT - 8

"to dispose of slower moving inventory to increase operational capacity." Funko's share price decreased 40% in a single day following the news.

36.    Perlmutter and Fall Jung were Funko's President and CFO, respectively, at the time of the 2020 write-down and stock price drop and, as a result, well understood what would happen if the Company's inventory management was not done properly in the future. Inventory needs and availability were discussed in at least monthly Sales Operations meetings attended by Perlmutter, Jung, senior leaders and key account managers from the Sales and Operations Planning ("S&OP") group (which reported to Jung), and Sales team (which Perlmutter was heavily involved in), and from Chief Operating Officer ("COO") Joe Sansone's Fulfillment Operations group. The Vice President of Sales would request a particular amount of inventory be ordered based on Sales team demand forecasts for the upcoming quarters, ostensibly based on prior year sales and projected growth.

37.    However, according to a former Business Planner who worked for the Company's S&OP group from 2020 through at least 1Q22, the demand numbers provided by Sales were unrealistically optimistic given the evident sales growth slowdown following an unprecedented collectibles boom during the COVID-19 pandemic. The S&OP forecasts showed significantly lower growth in demand post-COVID-19. But although S&OP was intended to serve as a "gatekeeper" to verify Sales' demand numbers, it was widely known within the S&OP team that Funko's senior management was unwilling to accept that Funko might not continue to grow at the same rapid pace as it did during COVID-19 pandemic. The Company always adopted the Sales team's forecasts, and there were no effective controls in place to curb the excess inventory purchasing.

COMPLAINT - 9

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

38.     The Company was able to track inventory through a number of computer systems, including via Microsoft NAV. Reports were circulated among the Sales teams and at Sales Operations meetings showing what product was currently available for sale and when that product had been released. Funko also had data from their major retail clients as to what product had been sold from the stores' shelves, so they could see what was popular and what product wasn't moving. The Company also had detailed tracking information about the status of their product as it was shipped from the factories, and knew where the transocean shipping containers were and when the inventory would be due to arrive at Funko's distribution centers. The Sales team would discuss the products that weren't selling at the regular meetings, and would use the information on available, upcoming and trending products to come up with pitches for major retailers as to what product they should put on their Funko-allocated store shelf-space next. Ultimately, Funko's largest accounts – Amazon, Walmart, Target, and other "big box" stores – wanted to buy new Funko products, not reorder aging product Funko might still have in its inventory.

39.     Funko's risk of overbuying inventory was further exacerbated by its policy, in place until September 2022, of allowing retail customers to cancel or modify their orders up until the time the orders shipped from Funko's warehouse without penalty. For example, in 2021, Funko had a license to make FunkoPop!s of approximately a dozen movie characters from a Marvel movie that was anticipated to be a big hit, Eternals. But when the movie was released in November 2021, it was not popular with the public – certainly, it was not so popular that fans would eagerly snatch up FunkoPop!s of all of the characters. Seeing the writing on the wall, Funko retailers cancelled or substantially reduced their original orders of Eternals products. As a result, in 2022, Funko had huge amounts of unsold Eternals inventory sitting in its Washington warehouses that it knew it would never sell.

COMPLAINT - 10

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

**Funko's Plan to Upgrade its Inadequate Infrastructure**

40.    The Company knew that it could not continue to grow without undertaking some major infrastructure projects to support that growth. First among the needed upgrades was replacing the Company's enterprise resource planning ("ERP") software. The system that the Company had been using across its processes and in its warehouses, Microsoft NAV, was antiquated, designed for small- to mid-sized companies, and no longer able to handle the workload that the Company was putting on it. Not only was the system in its current state underpowered, but employees frustrated with its functionality often had to use manual workarounds to get the analytics and data they wanted. The S&OP team, for example, often used Excel spreadsheets for their analytics rather than use Microsoft NAV. A more powerful system was needed that could integrate the data from all of the Company's various functions (*e.g.*, accounting and finance, supply chain, demand planning, inventory management, sales) as well as those of its acquired companies (Loungefly, and later, Mondo) and provide the analytic tools necessary to ensure the Company's operations could be run efficiently and its financial information tracked reliably. In 2020, the Company decided to go with Oracle as its new ERP system.

41.    The Individual Defendants understood that transferring the Company's systems and databases from its current system to Oracle was a massive endeavor, and hired several third-party contractors (the lead contractor being IT consulting firm Infosys) to assist Funko with the implementation. Later, smaller pieces of the Oracle implementation were allotted to other firms: Inspirage, Redwood, and Logistics, which designed the portion of the system that would work with parcel companies like FedEx and UPS. After little progress had been made on the project by the end of 2020, in February 2021, Funko hired an ERP Program Manager to serve as a liaison between the Company and Infosys and to oversee the resources assigned to the implementation program.

COMPLAINT - 11

While the project was originally under the direction of Vice President of Technology David Horner, who reported to Sansone, in spring 2021, Sansone took over the project himself.

**The Oracle Project Highlights Serious Flaws in Funko's Operations**

42. By early 2022, the Oracle project had highlighted numerous, deep-rooted flaws in Funko's operations. In order for Oracle to be effective, Funko needed to "clean" the Company's existing data so that it could be transferred to Oracle properly. This meant Company employees needed to ensure each line of data was accurate, complete, in the right format, and categorized in an appropriate way under Oracle's rules such that it would be captured and usable in the new system. This was an extensive job. For example, the Company's S&OP group's business analytics system required up to 80 points of data for Oracle to operate correctly with respect to just a single product, or "SKU." That meant that someone on the S&OP team with the requisite institutional knowledge of what information was needed would have to manually go through each point of data for each SKU to ensure it was correct before it could be transferred.

43. This would be a manually intensive process even in a company with generally clean data – and Funko's data was a mess. The Company did not have any data governance – *i.e.*, controls and processes for who creates certain data and how it should be entered into the system – so even the data within a certain function or business line was inconsistent and often incomplete. The employee responsible for conforming the financial data of one of the Company's business units for transfer repeatedly voiced concerns to VP of Merchandising, Planning and Procurement Mike Smith and Manager of Merchandise Financial Planning, Ben Kaestner, about the Company's lack of data governance controls during team meetings to discuss the Oracle project, with no resulting action taken.

COMPLAINT - 12

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

44.      Funko also wasn't dedicating the necessary organizational resources – nor did management have the necessary experience in ERP system implementation – to ensure that the Oracle integration was done correctly, or that the data transfer would be timely completed. For example, although Funko wanted "New Product Introduction" to be a process included in Oracle, it did not assign anyone to oversee the conversion of data related to and needed for that process into the system.

**Oracle's Progress is Hindered by Corporate Infighting**

45.      Perhaps most problematically, the Oracle project was hindered by deep rifts among Funko senior leadership, which was dysfunctional and indecisive, with constant infighting among key leaders and significant turnover among senior personnel. (For example, within January 2022 alone, S&OP was led by three different people, as Smith, Kaestner, and then Kaestner's replacement each quit.) For the Oracle project to succeed, Funko leadership needed to work together to make decisions as to how the system should be set up, including what business processes should be included in the Oracle integration and how they wanted those processes to function before the system architecture could be designed and implemented. The C-Suite simply could not get "aligned" as to these critical systems architecture decisions, despite bi-weekly "Steering Committee" leadership meetings with all of the C-Suite individuals involved. Fall Jung and Sansone in particular were "oil and water" and constantly at odds with one another at these meetings.

46.      By early 2022, it was clear to employees across the Company's various departments that the Oracle project was far from being able to launch by the Company's targeted 2Q22 deadline. The employee cleaning one business unit's financial data told Fall Jung in January or February 2022 during a one-on-one video call that the employee could not see the Oracle program

COMPLAINT - 13

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

being completed on time and that the project was not going well. IT systems and logistics employees in Funko's U.K. office, which worked with the U.S. office on designing the global Oracle plan reported that in early 2022, it was "quite clear" the project was "not in a good place" and that basic decisions regarding how the Oracle system was going to operate, and who would even be in charge of maintaining the system once it was implemented, had still not even been discussed. As of January 2022, senior IT management did not have a timeline they could provide employees for when the project would realistically be able to go live.

**Funko Plans an Upgraded Distribution Center**

47.    The Oracle project was critical to Funko's other major infrastructure project: Funko's consolidation and relocation of its five Washington distribution facilities to one state-of-the-art fulfillment and distribution center that operated on Oracle WMS.

48.    The Company's U.K. office had successfully opened a new, state-of-the-art distribution center operating on a different WMS in 2020. The 349,000 square foot distribution center took 15 months to design and complete.

49.    Funko's consolidated distribution center in the U.S. would dwarf the recently completed facility in the U.K., as well as its largest operating warehouse in the U.S. (approximately 200,000 square feet). In September 2021, Funko entered into a lease agreement for a mammoth 860,000 square foot warehouse and distribution center in Buckeye, Arizona (the "Buckeye DC" or "DC"). Buckeye was chosen for Arizona's lower labor costs, its proximity to Long Beach, California's shipping ports, and the fact that there were other large retail operations with distribution centers nearby (Five Below's distribution center was right next door), theoretically providing a pool of experienced applicants to the new Funko DC.

COMPLAINT - 14

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

50.     Funko's Operations group and Finance group were both involved in planning the new DC, with the Finance group's demand planners providing information on anticipated sales and how much product the warehouse would need to store. The new DC would be run by Senior Director of Fulfillment Operations Dave Tarnosky (who, in turn, reported to VP of Operations Alex Poole and COO Joe Sansone). The DC would have state-of-the-art technology and equipment and include an entire building devoted just to distribution of orders from Funko's growing e-Commerce (direct-to-consumer) business, led by Tarnosky direct-report Rich Schacht. That building would not only house e-Commerce product, it would have specialized high-tech equipment, including a maze-like conveyor belt system, designed for Oracle, that would run through the warehouse (enhancing the efficiency of selecting product for and shipping numerous small orders).

51.     The Oracle WMS would be essential in enabling workers to efficiently navigate the behemoth new DC and to obtaining the benefits of scale that Funko's anticipated growth required. The Oracle WMS would: (i) allow the DC's Receiving team to scan inventory from trucks as new product came in, confirm that the correct products had been received and that none were missing from the incoming trailers or transocean shipping containers, and identify where in the facility to unload it; (ii) enable workers fulfilling orders ("Pickers") to find where a particular product was housed in the facility and who had put it there so they could "pick" the product for the order or correct product misplacements quickly; and (iii) allow the Freight team to pack and track large retail orders as they were fulfilled.

52.     Throughout 2021, Continuous Improvement Manager Chris Chromy held meetings with warehouse Supervisors, Managers, as well as Funko leadership (such as Tarnosky and Poole) to discuss how Oracle should and would be implemented at the new DC. Warehouse management

COMPLAINT - 15

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

also met with the Oracle implementation team to discuss the specifics of fulfillment and distribution operations so that the business processes and functionality that the DC needed could be integrated into the new system. The discussions included broader process-related issues as well as details such as how long it took workers to unload a truck. The Oracle implementation team provided numerous iterations of Oracle test modules for the DC during 2021, but each time, the programs did not meet warehouse needs or were otherwise non-functional. Meetings between warehouse management and the Oracle integration team stopped before the end of 2021, with no resolution to the Oracle module issues

**Funko's Struggling Operations is Concealed from Investors**

53.    On March 3, 2022, Funko filed a Form 8-K and Form 10-K for the year ended December 31, 2021 ("FY21") with the SEC and held an earnings call discussing financial results for 4Q21 and FY21 and providing financial guidance for 2022. The Individual Defendants touted not only Funko's exceptional revenue growth over the past year, but provided FY22 guidance that far exceeded analyst expectations: adjusted earnings per diluted share of $1.75-$1.91 (versus analyst consensus of $1.39), with adjusted EBITDA margin flat at 14.6% despite higher-than-normal Selling, General and Administrative ("SG&A") expenses due to the Oracle implementation and Buckeye DC opening during the first half of the year. Perlmutter, on his first earnings call since being promoted to Funko's CEO in January 2022, emphasized that Funko had "proven our ability to deliver in difficult environments, and I'm very confident we are well positioned to meet our objectives for the full year."

54.    Speaking to the Company's inventory levels, Fall Jung stated that "[i]nventory at quarter end totaled $162 million, down sequentially from last quarter, but still reflecting an

COMPLAINT - 16

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

elevated rate of inventory in transit at 40% as transaction freight times remain[] well above pre-pandemic durations."

55.     Providing an update on the ERP and Buckeye DC projects, Fall Jung stated that "SG&A as a percent of sales is also expected to be slightly higher in the first half of the year due to the timing of project costs associated with the consolidation and relocation of our distribution center as well as our ERP implementation." Jefferies, LLC ("Jefferies") followed up on the statement later in the call, asking Fall Jung: "You gave 80 basis points of pressure from – it seems like more of a transitory DC and ERP implementation and transition. Any context on when that 80 basis points is concentrated? Is it first half, second half? Anything we should be mindful of?" Fall Jung affirmed: "Yes, Yes, first half for sure. [W]e will probably launch in the beginning early [sic] the Q3 for the ERP, but the distribution center move will happen in the first half."

56.     Internally, however, it was clear that the Company's infrastructure projects were nowhere close to being completed (or their costs accrued) by the deadlines Fall Jung promised so affirmatively. Numerous employees involved with the Oracle project stated that by January 2022, it was evident inside the Company that the ERP would not be operative by July or August 2022 (*i.e.*, the first two months of 3Q22). They did not know why Fall Jung would have stated that it could be live by that time, particularly since the C-Suite received regular status reports discussing the ongoing problems that needed to be dealt with (but weren't being dealt with) prior to the project's implementation.

57.     More, Funko's lease for the Buckeye DC allowed them to occupy the space on April 1, 2022, and when they moved in, it would be a largely blank canvas. Funko would have to build bathrooms, offices for warehouse management, not to mention the storage racks and equipment installation necessary for a functional distribution center. There were nowhere near

COMPLAINT - 17

enough employees transferring from Funko's Washington warehouses to fully staff the huge Buckeye DC (it was anticipated to require 300 more workers, at least), and Funko hadn't done any of the needed hiring yet. In fact, the plan was for warehouse workers to be hired in "waves" so that the experienced Washington supervisors could train the new Buckeye DC hires appropriately. And, as explained above, the Oracle WMS – the system that the entire DC was planned around – would not be available.

58. On April 4, 2022, the warehouse "opened" for warehouse management who had moved from Washington to come for their first day of work, to tour the warehouse space and make plans for training new employees. There were no offices, and the Company was operating the DC under a temporary certificate of occupancy, with necessary building work – like installation of the storage racks that Funko's product would be placed on (each of which had to be inspected and permitted by the local government building office), and equipping loading bays to receive product – months from being completed.

59. By the time new employee training started in late April, the Company had not yet finished building out the space. Other problems with the DC were also apparent. The corporate team responsible for ordering warehouse equipment had not spoken to warehouse management before ordering, and the equipment was not adequate for worker needs. For example, the Company had purchased "extendo" conveyor belt systems that hooked up to the backs of trailers to help load and unload them. But the systems they purchased were too tall for most employees to be able to lift boxes on and off the belts to load the trucks. The need to work around equipment, rather than with it, caused extensive delays and decreased DC productivity. Similarly, despite the fact that the massive warehouse had been designed to have at least eight levels of vertical shelving, the warehouse only had one "E-Pick" reach truck that was capable of reaching the top three levels.

COMPLAINT - 18

60.     Additionally, the Company had so much inventory in its Washington warehouses that it would take three months to truck it all to Arizona utilizing rented trucks and trailers. At the beginning of 2022, each of Funko's five Washington warehouses and distribution centers was operating roughly at capacity. The plan was to stagger the inventory's arrival: first, retail inventory would be sent, then e-Commerce product. Loungefly inventory, which had always been stored and shipped via a third-party logistics company, would continue to be stored and shipped via third-party services. Trucks began arriving in Buckeye with inventory from the Washington warehouses in late April, despite the fact that only a fraction of the loading bays (12 of the planned 84) were operable for Receiving and racks were still under construction.

61.     The Receiving department was given a quota of receiving, unloading and putting away 10 trailer loads of inventory per day, around 20,000 units of product. Since the trailers were rented, they would continue to rack up charges the longer they sat and waited to be unloaded – Funko needed them unloaded promptly to avoid incurring more cost.

62.     Foreseeably, the DC was wholly unprepared for the onslaught of inventory. The warehouse workers on the Receiving team, some new hires to Funko and others temporary employees sent by an outside agency, had not yet received their training, and there were no usable Standards of Procedure ("SOPs") describing how the Receiving process was supposed to work at the Buckeye warehouse. One former warehouse employee recalled going to the DC in early April for an interview and a tour of the distribution center, and he and other prospective employees seeing several trucks containing Funko product pull up to the building. The DC employees giving the tour asked the prospective employees if they would be willing to start working immediately, quickly certified the group to operate the machinery, and told the group to start putting the product they were unloading on any open racks in the warehouse. None of the product was scanned in

COMPLAINT - 19

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

electronically so that its location would be tracked within the enormous DC. A former Operations Lead at one of Funko's Washington warehouses who was sent to Buckeye in May 2022 to train new DC employees repeatedly witnessed the Receiving team unload inventory from the Washington warehouses without reviewing the associated shipping documentation and double-checking inventory counts, a problem the horrified Operations Lead told DC management would "come back to haunt" the Company if not fixed quickly (it was not, and did).

63.    Further, when workers did review the shipping documentation for the trucks coming in from the Washington warehouses, it was apparent that employees loading the trucks had bungled the transfer paperwork – trailers were missing product, had extra product, or contained entirely different product than what was supposed to be in the delivery. Eventually, someone directed the workers receiving product at the Buckeye DC to update the Microsoft NAV ("NAV") system with the number of products the DC actually received, changing important inventory counts in the Company's system. (Because NAV did not limit user permissions to be able to change these counts, and new hires' NAV credentials were created by mirroring the permissions of other workers' accounts, most workers could do so.) When a new shipping container came in, there was no way to confirm that the product received was the same product that was supposed to be in the container, making inventory tracking nearly impossible. One former Operations Lead recalled having to deal with "50 investigations" per day while in Buckeye – instances in which an employee identified that specific inventory wasn't located where it was supposed to be in the DC, and the team would have to track it down.

64.    The former Operations Lead was so concerned by what they saw at Buckeye that they wrote a heated letter to an Operations Manager at Funko. The letter described the ways in which warehouse supervisors were not following correct receiving/inventory processes. When the

COMPLAINT - 20

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
ᴛᴇʟ 206.621.6566
ꜰᴀx 206.621.9686

former employee returned to Everett after two weeks in Buckeye, Tarnosky interviewed the employee about the contents of the letter in person, seeming to agree with its contents.

65. At bottom, the fact that the warehouse had been designed to utilize Oracle, but was instead operating on Microsoft NAV, was causing major disruption. The Receiving process written for Oracle would have had the Receiving team: scan incoming inventory when it was unloaded, view in Oracle which shelf the inventory was designated to put it on, put the inventory on the shelf, and then scan that location so that the inventory was registered at the location and it was recorded who specifically handled it. NAV was not nearly as precise – not to mention that the lack of equipment within the DC meant that a majority of the handheld scanners at the warehouse were used by the Pickers and frequently not available to Receiving during the first month.

66. The antiquated NAV system simply could not handle the workload of the new consolidated warehouse, and Buckeye DC workers frequently experienced system errors and problems getting updated information from the system. The issues on Microsoft NAV became so problematic that DC workers began using Excel spreadsheets or even written notes to account for shipments, rather than doing so in NAV. Notably, the Company had made no effort to train any of the DC employees on the Oracle system purportedly set to go live in early 3Q22, at any point in the first half of 2022, nor was training new employees on the Oracle WMS discussed.

67. Within a month of the DC opening, there were no more available racks for the Receiving team to use when unloading the truck trailers from Washington. When that happened, product was stacked in a large rectangular area of warehouse floor without any particular organization or identification. Pickers trying to locate product for order fulfillment had no idea where to locate items – NAV would simply direct them to a general area of the warehouse where boxes of unknown product were stacked haphazardly. Because it could take hours to fulfill a single

COMPLAINT - 21

order if product was in that "lost" area, and because the Company generally did not ship orders until all or at least a significant portion of items in the order were in stock, order fulfillment began to get backed up. Pallets of partial orders waiting to be completed littered the floor. An Operations Manager at Buckeye estimates that approximately 50% of the Washington inventory was misplaced, its location unknown within the warehouse.

68.     Compounding the lack of storage, senior management, including VP of Operations Alex Poole (who reported to Sansone), had decided to ship all of the "dead" inventory in the Washington warehouses to Buckeye rather than dispose of it. And there was a lot of dead inventory – according to a Supervisor in EV1, the Company's largest warehouse, approximately 25% of the warehoused product in EV1 was dead inventory at the beginning of 2022. Employees could determine product was dead by looking at the Company's various computer systems (including NAV) to see when it had been released or last been sold, and it was obvious to any casual observer which warehoused product was dead as well – boxes were caked in dust and clearly had not been moved in years.

69.     Another warehouse Supervisor and longtime Funko employee, who worked at the Company at all relevant times confirmed that each of the five warehouses contained dead inventory mixed in the shelves among the selling product, although most was located in EV1. Up until 2020, the Company's headquarters had periodically provided a list of dead inventory with instructions for the warehouses to send it to third-party disposal service Green Planet to be destroyed and recycled (to the extent possible). However, when COVID-19 hit and Funko's sales shot up rapidly, Company management and warehouse workers were focused on achieving maximum sales and fulfilling the orders coming in, respectively, rather than managing the dead inventory.

COMPLAINT - 22

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

70.     Accordingly, by the time the inventory was being shipped to Buckeye in spring 2022, the Company had not destroyed any dead inventory in two years – during which time Funko had experienced pandemic-related shipping delays, delayed movie releases that had impacted product sales, the Eternals flop, and other significant events that increased the amount of dead inventory on hand. One warehouse Supervisor estimated that approximately 30% of the Washington inventory received at Buckeye in spring 2022 was already dead. Another recalls discussing the decision not to deal with the dead inventory with Tarnosky and his direct report, Assistant General Manager John Mora, in early 2022, and being told "[t]he decision was made and communicated down that we are just going to send it all and sort it when we get there." That decision not only cost Funko hundreds of thousands of dollars in shipping, but also clogged up Buckeye's operations: unsellable product needed to be unloaded and stored, taking up man-hours, unloading equipment (a scarce resource at Buckeye) and rack space badly needed for inventory that had actually been ordered by customers.

71.     On May 5, 2022, as the Buckeye DC was struggling to get operations underway, Funko filed a Form 8-K with the SEC announcing its financial results for 1Q22. Among the figures reported was that Funko's inventories at the end of 1Q22 totaled $161.5 million, up 160.8% over the prior year. According to the release, "[r]eported inventory includes in-transit inventory, which comprised 40% of total inventory, reflecting a significant increase in trans-ocean times due to pandemic-related supply chain disruptions." The release also provided updated FY22 financial guidance, raising its net sales guidance and maintaining that adjusted EBITDA margin would be approximately 14.6%, reflecting "approximately 80 bps of headwind from one-time project spend associated with the consolidation and relocation of our U.S.-based distribution center and the implementation of our new ERP system."

COMPLAINT - 23

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

72. On the Company's earnings call later that day, Fall Jung once again reiterated that Funko "remain[ed] on track to reach our full year adjusted EBITDA target of a margin consistent with 2021 results," and that the target "reflects the ongoing freight inflation headwinds as well as approximately 80 basis points of pressure due to onetime project spend from the consolidation and relocation of our distribution centers and the implementation of our ERP system." Asked by an analyst about the project spend for the ERP and DC, specifically how much the Company anticipated spending and in what quarters, Fall Jung affirmed, "yes, we reported out that was about 80 basis points on the year, all of which will happen in the first half of the year. It's about 2 points of pressure just in Q2 on adjusted EBITDA. So we're launching – or we did launch the new DC in April, and the ERP is set to come out at the end of the quarter. . . . It's really the pressures [sic] all in the first half of the year, specifically Q2."

73. According to numerous former Funko employees involved in the Oracle project, the Company was certainly not going to launch its ERP by the end of June. The warehouse Supervisor who worked on the project with Funko IT and the Oracle implementation team stated that he had listened to the 2Q22 earnings call, and thought Fall Jung's statement "was a weird thing to say, [we] were definitely not going to have it online" by the end of 2Q22. He and other warehouse Supervisors hadn't heard any mention of Oracle implementation, let alone been trained on Oracle, by the time of the 1Q22 earnings call.

74. Analysts reporting on the Company, however, took Fall Jung's representation that the additional SG&A costs would be limited to 1H22 at face value. Jefferies noted in its May 5, 2022 report that "SG&A % takes a 100bps quarterly step-up in Q2 for ERP implementation timing & DC relocation, followed by normalization in 2H22." D.A. Davidson & Co.'s ("D.A. Davidson") May 6, 2022 report stated that: "The vast majority of the one-time project spending will occur in

COMPLAINT - 24

2Q22, with an impact on EBITDA margin of ~200bp. Gross margin is expected to be down sequentially in 2Q22 due to the timing of certain items, and the SG&A expense ratio will be up sequentially due to the one-time spending, which should be complete by the end of 2Q22."

75.    Later, a May 2022 Funko investor presentation misleadingly touted the ways in which Funko was increasing operational efficiency, including by "Investing in Domestic ERP" and "Optimizing Inventory Levels" – glossing over the fact that, as the Individual Defendants knew, neither infrastructure project was in fact increasing Funko's operational efficiency.

76.    By June, the chaos at the Buckeye warehouse had only increased. VP of Operations Alex Poole, who had been largely responsible for the Buckeye warehouse, quit. Soon after, COO Sansone began appearing at Buckeye regularly, spending at least one or two weeks per month at the warehouse, having meetings with Tarnosky and Mora about the DC and walking the floor speaking with warehouse employees trying to solve immediate problems. Employees wanting to train on the Oracle ERP system they had been told by Funko's Human Resources group that the warehouse was eventually going to run on before they were hired were told that training on the system was not happening. There still were no SOPs for the various roles in the warehouse, and Funko was realizing it had hired too many people for certain roles, and too few in others. As a result, few of the new Buckeye employees that had been hired knew what they were supposed to be doing and entire shifts of individuals ended up with nothing to do except sweep the warehouse floors. The DC was still being built out (though the Company finally received a permanent certificate of occupancy in June), and they still were in desperate need of additional equipment (by June, the DC had acquired two more high-reach "E-Pick" machines, for a grand total of three). Racks were filled as soon as they were usable, with the DC regularly operating at over 95% capacity. Rented trailers of inventory from the Washington warehouses were still steadily arriving,

COMPLAINT - 25

being unloaded, and with no Oracle system to assist with keeping track of inventory placement, manually checked into storage at the warehouse or misplaced. The number of needed daily "investigations" into missing or misplaced inventory grew as high as 120 per day.

77.    The chaos increased exponentially at the end of the month, when shipping containers that had been held up in transit during the COVID-19-related freight slowdowns and port delays in 4Q21 and 1Q22 finally started to arrive with additional inventory. By July 2022, the containers were arriving en masse, along with the remaining trailers from Washington. But the existing racks in the Buckeye DC were already full (including with a substantial amount of non-moving and dead inventory), and while more were still being constructed, workers already had problems finding storage for the remaining Washington inventory. The ocean containers coming in had no place to go but the parking lot until there was space for them to be unloaded. Not only was this a problem in terms of logistics, but it was expensive – the containers were rented, freight rates were exceptionally high due to the ongoing shortage of shipping containers, and Funko continued accruing rental charges and late penalties the longer the containers sat unloaded. Throughout 3Q22, Funko had between 300 and 500 unloaded containers of product sitting outside the warehouse on any given day.

78.    On August 4, 2022, four months after Buckeye opened, Funko filed a Form 8-K announcing its financial results from 2Q22. Gross margin had decreased from 1Q22 by 260 basis points, while SG&A expenses increased to $82.7 million, or 26.2% of net sales, "reflecting higher costs in the second quarter related to the relocation and consolidation of our distribution centers, ERP implementation-related expenses" as promised. Inventories at the end of 2Q22 totaled $234.0 million, up 170.9% compared to a year earlier, and $72.5 million higher than at the end of 1Q22. The Company attributed the increase to "receipt of delayed inventory as pandemic-related supply

COMPLAINT - 26

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

chain disruptions began to improve towards the end of the quarter" – omitting any mention of the millions of dollars of unsellable inventory now sitting in the Buckeye warehouse, or that the delayed inventory had just months to be sold before it too would be considered dead. Despite its snowballing SG&A costs and inability to make sales due to clogged distribution channels, the Company raised its 2022 net income guidance for the second quarter in a row, and once again maintained it would meet an adjusted EBITDA margin of approximately 14.6% (despite its significant margin decrease in the first half of the year), with adjusted earnings per diluted share of $1.88 to $1.99.

79.    The Company's 2Q22 Form 10-Q, also filed on August 4, 2022, disclosed for the first time that the Company "expect[ed] personnel and related costs to remain elevated through at least the end of 2022 to support the final transitions of our U.S. distribution warehouses, additional personnel to support strategic initiatives and overall business growth and due to additional inflationary pressures to increase wages, commissions and benefits expenses," and "also expect[ed] elevated costs related to our enterprise resource planning ('ERP') implementation as we expect to finalize the remaining steps in early 2023" – misleadingly minimizing the havoc at the DC by claiming the Company was just in the "final transition[]" stage, and continuing to conceal that the ERP implementation had been critical to the Buckeye DC's ability to operate.

80.    On the 2Q22 earnings call later that day, Fall Jung clarified that Funko had "recently made the difficult decision to delay" its ERP implementation until 2023, because "ultimately, we did not want to impair the momentum that we have today by shifting to a platform that we felt wasn't yet fully ready to support our business." When an analyst asked her whether pushing out Funko's ERP initiative meant that there would be less SG&A costs associated with the ERP in 2022, Fall Jung misleadingly downplayed the SG&A costs remaining in 2022, saying:

COMPLAINT - 27

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

No . . . the run rate will continue. But there's other offsetting factors to that. So we don't see it as a major headwind in 2022 so far, but we feel good we made the right decision for the business to not have business interruption as we go into the holiday season.

81.     Regarding inventory, Fall Jung omitted mention of the problems caused by the dead inventory clogging up Buckeye or the amount of aged inventory sitting in its parking lot, instead representing that "[w]hile our inventory levels are up year-over-year, we believe that inventory is generally high quality and leave[s] us well positioned to meet our consumer demand and support our strong second half growth forecast." Asked about "where the inventory resides, how much of it is related to the DC relocation," Fall Jung claimed that "in Q4 [we] had a lot of delays that rolled into Q1 just due to the congestion within the supply chain. And you're seeing a little bit of that in Q2 as well. . . . So there is a large portion of the in-transit, but we're working to get that into the DC and get that out to our customers."

82.     Following the August 4, 2022 earnings call, Funko's Class A share price declined by $4.88, or approximately 18%, dropping from a closing price of $26.69 on August 4, 2022, to close at $21.81 on August 5, 2022. Analyst commentary was surprised that guidance did not increase given the better-than-expected 2Q22 sales, but accepted management's representations that they were simply being "conservative" about retail demand in the second half of 2022.

83.     By September 2022, Funko's lack of order fulfillment capabilities was impacting its forward sales. Sales team members were given sales quotas that they were supposed to hit for certain periods that were simply impossible for most team members to meet due to missing product and artificial product shortages arising from the inability to unload containers. The NAV system used at the warehouse would not show product as in stock and available for "picking" unless it had been physically unloaded in the warehouse – product in the containers wouldn't be registered as in stock. By August 2022, the DC was already more than 50 days behind in fulfilling backlogged

COMPLAINT - 28

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

orders, and 3Q22 and early 4Q22 were generally when retailers ordered and expected shipment of their holiday stock.

84.    Although logistics planners in Everett and Buckeye tried to coordinate plans to determine which containers were "hot" for the day – *i.e.*, which needed to be prioritized either for a specific order or because the shipping containers were getting too expensive or the product it contained was aging out of being sellable – the DC could not keep up with Sales team needs. There was a constant battle between warehouse departments to use the high reach E-Pick machines, leading to long periods of downtime for those teams that needed to, but couldn't, reach product on the top shelves. The promised conveyor belt system for the e-Commerce building had been designed to be used with Oracle, under constant construction since the warehouse opened and had never been used, meaning that Pickers in that department had to trek across the warehouse to locate any individual's order and get it to the shipping department – a time-consuming and highly inefficient process given the size of the massive building. (The expensive conveyor belt would ultimately be abandoned in 4Q22, being used only a handful of times before it was deemed unusable for its purpose without Oracle.) And, with the DC more than 95% filled at any given time, and overflow inventory being stored on the floors and loading bays, it was difficult for employees to move around, let alone locate and ship pallets of product efficiently.

85.    Orders started to be shipped while only partially fulfilled, with in-stock inventory allocated among the various key accounts that had ordered it. Some retail customers cancelled orders altogether, since their shipments were so delayed the product was no longer considered "new" or it would not arrive by the needed point in time, while other retailers only wanted the product if they could obtain a certain quantity. The backlog was so intractable that in one instance an Account Manager for a large specialty retailer needed a large amount of Valentine's Day

COMPLAINT - 29

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

product unloaded and shipped by October 2022 at the latest, and was told that the earliest the DC could get the product out was May 2023, seven months later. Unsurprisingly, that customer cancelled their order. Funko's new Vice President of Operations, Justin Serfass, routinely reminded DC supervisors that Buckeye's problems stemmed from Funko's poor forecasting and resultant over-ordering of product, and its failure to get an ERP system in place, and that the DC just had to do the best it could.

86.     Amidst this chaos, on September 13, 2022, the Individual Defendants held a Funko investor day, laying out their strategy for successful growth and their plan to hit a 20% adjusted EBITDA margin by 2026. Fall Jung expressed her confidence in their ability to hit the adjusted EBITDA margin target, saying "[w]e know we're going to get to 20% adjusted EBITDA over the course of this time," and that a major reason for that confidence was the Company's ability to obtain improved operating cost and leverage. According to Fall Jung, the Company's new DC would streamline their logistics, and getting the ERP up and running in 2023 would provide increased operational efficiencies. Asked about future investment needed for the internal growth Funko planned, Fall Jung represented: "Obviously down the road, we'll eventually need probably more distribution capabilities to continue support[ing] the growth, but that's more of a future down the road within the 5-year plan, but not directly related within the next, call it, 12 months or so."

87.     With hundreds of containers of product that had been intended for Halloween and Christmas holiday sales and timed content releases sitting unopened in its Buckeye DC parking lot, Funko needed a solution. Despite Fall Jung's statement to investors less than two weeks earlier that Funko would not need additional distribution capabilities for at least a year, by the end of September, Funko had hired third-party logistics company Unis in nearby Goodyear, Arizona, to store slow-moving and dead inventory. Within a few months, they had filled their space in the first

COMPLAINT - 30

Unis warehouse and had rented space in a second for the remaining slow-moving and dead inventory. Altogether, that inventory took up between 300,000 and 400,000 square feet of space – an amount of product equivalent to 1/3 to 1/2 the square footage of the Buckeye DC

**The Execution Problems Are Brought to Light**

88.     Following Funko's enthusiastic Investor Day in September, and with the high SG&A spend of 1H22 supposedly over, analysts were optimistic for the Company's 3Q22 results and updated FY22 guidance.

89.     Those expectations were soon smashed, however, when Funko filed a Form 8-K and Form 8-K/A with the SEC, both signed by Fall Jung, announcing its 3Q22 results on November 3, 2022. While sales in 3Q22 exceeded analyst expectations, net income margin decreased 390 basis points to just 3%, adjusted EBITDA margin decreased 520 basis points to 9.8%, and SG&A costs were a whopping $97.9 million, supposedly due to "increased infrastructure investment to accommodate recent rapid growth and provide capacity for sustained future growth." Adjusted earnings per diluted share for the quarter missed analyst consensus by nearly 45%, while inventories were $265.8 million – an increase of $31.8 million, or 13.5%, over 2Q22 levels, and 88.7% higher than at the end of 3Q21. The Company also reduced its 2022 financial guidance, telling investors to expect "[s]equential decline in gross margin due to margin seasonality and ongoing inventory management"; adjusted EBITDA margin of high single digits instead of the previously guided 14.6%; adjusted net income of $39 million to $41 million (previously $101.8 million to $107.3 million); and adjusted earnings per diluted share of $0.70 to $0.80 (previously $1.88 to $1.99).

90.     The Company's Form 10-Q for 3Q22, signed by Fall Jung and certified by both Perlmutter and Fall Jung, also disclosed that Funko management had identified material

COMPLAINT - 31

weaknesses in the Company's financial control over financial reporting, such that there was a reasonable possibility that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected on a timely basis. Specifically, the deficiencies related to Funko's general information technology controls ("GITCs"), due to:

> ineffectively designed and implemented user access controls and segregation of duties controls within information technology systems utilized by the Company in its financial reporting. As such, certain manual and automated business process controls were deemed ineffective because they are dependent on the affected GITCs or rely on information from the impacted systems.

91.     The Form 10-Q also noted that there had been "no changes in our internal control over financial reporting during the quarter ended September 30, 2022" – meaning that the same deficient internal controls had been present in 2Q22 as well.

92.     On the Company's 3Q22 earnings call later that day, Perlmutter finally admitted that Funko's DC had been designed to run on the Oracle WMS, that Funko had elected to open the DC before Oracle was ready, and that the Company's "higher-than-expected short-term operating expenses" had caused the lowered EBITDA margin guidance. Fall Jung acknowledged that the "higher expenses consisted primarily of greater labor costs within the facility and additional machinery to support product movement" and that in 3Q22, the additional investment in labor alone reduced adjusted EBITDA by approximately $5 million, while SG&A had increased to 27% of sales. And, despite having stated just weeks earlier that Funko would not need additional operational capacity for at least 12 months, Fall Jung now informed investors that the Company had also added third-party logistics warehouse space in 3Q22. She also stated that the Individual Defendants expected the SG&A investment impact on Funko's margin profile to largely persist until the completion of the belated ERP implementation, and that the Company had taken on additional debt in order "to support the near-term infrastructure investments and offset our

COMPLAINT - 32

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

increased working capital needs stemming from our inventory timing." More, the Company expected SG&A costs in 4Q22 to be even higher than in 3Q22.

93.    With respect to the Company's bloated inventory levels, Fall Jung still misleadingly asserted that the inventory was "generally high quality," and that Funko would "continue to work through inventory levels and expect to make sequential progress." In response to analyst questions about the inventory, Fall Jung continued to downplay the severity of Funko's problems, claiming that "yes, it is up year-over-year," but "last year was a pretty tight inventory environment because we were dealing with the supply chain challenges."

94.    Asked by an incredulous analyst, "this infrastructure thing, how did it become a surprise," Perlmutter lamely responded:

> It was a – we launched the new warehouse. We made the decision to move the new warehouse with a delayed ERP and part of that ERP is what's called WMS, which is warehouse management software thing. And basically, that's how you optimize the layout of that warehouse. And so when that ERP is [delayed], it came with the extra work around having to create manual processes to optimize that warehouse, which would normally have been done in an operating system, but unfortunately, we didn't have.
>
> So that's – was it a surprise? I would say it caused us more manual processes than we expected. So yes, I think that, that was something that caught us a little bit off guard. But obviously, we're pushing through and we're creating the manual workarounds to continue to get that revenue [out] the door.

95.    Fall Jung added: "[G]iven that we did launch it in Q2, we did expect, any new DC, we did expect hiccups around the launch of it, what I think is the bigger – unfortunate part is that they continued on whereas we expected them in the Q2."

96.    Analysts were floored by the revelations, and clearly were not assuaged by the Individual Defendants' claims that these expenses were truly "surprise[s]." In its November 3, 2022 report, Truist Securities ("Truist") stated: "Not only do we have little confidence in the company's ability to deliver on near-term goals but elevated inventory and higher costs currently impairs any type of visibility well into 2023. We also believe a credibility issue could weigh on

COMPLAINT - 33

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

shares over the foreseeable future . . . ." The Truist report further stated: "[T]onight's commentary/guidance was inexplicable, to us. . . . Not only had FNKO provided guidance nearly 1/2 way through 3Q, but management hosted an investor event just 7 weeks ago where it outlined lofty L-T financial targets." In its November 4, 2022 report, D.A. Davidson stated, "[i]t feels like we were hit with a bomb" and "[w]e think FNKO should have made disclosures at its investor day." BMO Capital Markets' ("BMO") November 4, 2022 report noted that: "FNKO reduced 2022 sales guidance, as all toy companies have done, but slashed profit outlook due to higher than expected infrastructure investment expense. After hosting an investor day in September, this revised outlook caught investors off guard."

97.    Following Funko's November 3, 2022 disclosures, Funko's stock dropped an astounding 59%, closing at $7.92 per share on November 4, 2022, from a prior day close of $19.50.

98.    The Funko Board, led by the TCG Investor Consortium,  swiftly made changes in the C-Suite. On December 5, 2022, Funko issued a press release announcing "a series of leadership changes to strengthen the Company's operations, drive enhanced returns for stockholders and best position Funko to capture the significant opportunities ahead." Perlmutter was demoted back to President effective immediately, where he would once again "focus primarily on growing the Company's brands." Fall Jung "stepp[ed] down" as CFO, effective immediately. Since the transition had not been planned and the Board had no replacement candidate in mind, the Board retained an interim CFO, Scott Yessner, through a talent services firm. The Board brought back Mariotti, former CEO and current Chief Creative Officer, as CEO. Mariotti had "a mandate from the Board to identify operational improvements while continuing to drive profitable growth." Finally, the Board created a new "Chief Operating Officer" role and retained Steve Nave as a

COMPLAINT - 34

consultant to focus on operations. On March 1, 2023, the Company issued a press release announcing that Steve Nave had been hired to be both the Company's CFO and its COO.

99.    In a separate release issued March 1, 2023 on Form 8-K, Funko reported its 4Q22 and FY22 financial results. The release claimed that during the quarter, Funko had "made progress in addressing operational issues that impacted our results in the second half of 2022," and "strengthened our executive and operational management team and have taken significant steps to improve our operating efficiency." Nevertheless, in 4Q22, net income decreased 368% year-over-year, adjusted EBITDA decreased 116% year-over-year, gross margin was just 28.3% versus analyst consensus of 32.7%, and the Company experienced an adjusted loss per diluted share of $(0.35).

100.    Net income for FY22 decreased 108% compared to FY21, adjusted EBITDA margin decreased 720 bps, to 7.4% (approximately half of what Funko had guided to 3/4 of the way through FY22). Meanwhile, the Company's adjusted earnings per diluted share for FY22 was just $0.57 – approximately 20% lower than the reduced $0.70 to $0.80 the Company had guided to in November. The Company also announced that, far from implementing the Oracle project in early 2023, as represented in November, the Company had decided to abandon the Oracle ERP project completely, taking a $32.5 million write down of capitalized costs associated with the years-long project. The Company also announced that it intended to eliminate and write down $30 million to $36 million of Funko inventory in the first half of 2023 in order to "manag[e] inventory levels to align with the operating capacity of our distribution center."

101.    Speaking on the Company's earnings call that day, Mariotti told analysts that, "[i]t was clear on our last earnings call that the business and our operations hit an inflection point, a

COMPLAINT - 35

combination of macro factors and Funko-specific issues have disrupted our financial and operating performance to an unacceptable degree." He acknowledged that:

> We are beyond the intended capacity of our Arizona-based distribution center. The volume is restricting our distribution center's throughput and incurring incremental container rental charges. By eliminating this inventory, which we expect to do in the first half of this year, we expect that we'll both reduce SG&A expenses and improve our gross margin by saving on incremental container rental charges.

102. Describing 4Q22's 28% gross margin, Nave attributed the shortfall to "container rental charges and, to a lesser extent, charge-backs," that the "container rental charges [were] incurred when capacity constraints within our distribution center prevented us from unloading containers," and disclosing that "[t]hese 2 factors reduced gross profit by approximately $15 million."

103. Nave also spoke on the Company's abandonment of the Oracle project, stating, "[w]e figured out in early part of this year, let's call it, January, that we were not going to be on time with the launch of the ERP that was scheduled to happen this summer," and that the Company would remedy "the biggest hamstring in [its] U.S. distribution," by implementing a separate warehouse management system over the summer. Nave had been able to tell within one month of his employment as Funko's Interim COO, and five-to-six months ahead of the intended ERP implementation, that the ERP would not be ready. Meanwhile, Mariotti referred to the Oracle project as "a fairly botched ERP process."

104. Speaking about the Company's DC problems, Nave conceded that "[t]he problem with the inventory is it just became too cumbersome to operate in any sort of efficient manner. . . . It's been incredibly inefficient both because of the system issue as well as the inventory starting to pile up." Asked by an analyst from BMO whether "now that you've stepped into this role and you had a look under the hood, do you have confidence in Funko's systems and ability to track that inventory?" Nave effectively said no:

COMPLAINT - 36

My confidence level, yes, we don't have the best systems right now, which is why we talked about things like an ERP and a warehouse management system. So I have confidence that we're going to get to a place where our systems infrastructure supports the business the way it needs to.

105. Following these revelations, Funko's Class A stock price closed at $9.94 on March 2, 2023 from a prior day close of $10.70 as the remaining inflation from the Individual Defendants' left Funko's share price.

## Subsequent Events

106. Shortly after the earnings call, pictures emerged online of hundreds of boxes of Funko product sitting in a landfill, which quickly went viral as media outlets and individuals reported or commented on the negative environmental impact of the move, among other aspects of Funko's decision. Unsurprisingly, Buckeye employees were still unpacking now-unsellable Christmas-themed inventory that had been sitting in the parking lot containers for months.

107. Then, on July 13, 2023, Funko issued a press release on Form 8-K announcing that Mariotti had "agreed to take a six month leave of absence from the Company and cease serving as Chief Executive Officer, effective immediately," though he would remain a member of the Board of Directors. It stated that "[o]n the Effective Date, the Company's Board . . . removed Mr. Mariotti from the office of Chief Executive Officer and appointed [Board member] Michael Lunsford as the Company's Interim Chief Executive Officer."

108. On the Company's August 3, 2023 2Q23 earnings call, Lunsford stated that his "mandate from the Board [is] to quickly reshape Funko to regain its nimbleness to return to growth and to be meaningfully more profitable." The Company also announced that it was conducting its second round of layoffs in the year (the first having occurred in February 2023), so that as of August, the Company had laid off 23% of its workforce for annualized savings of $30 million. Nave also stated that:

COMPLAINT - 37

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

[W]e're planning the back half of the year from an inventory perspective, a little bit different than what we've done in the past. What we've done in the past is we've always wanted to make sure that we were in stock for our retail partners. And this time around, we're willing to leave a little bit of sales on the table if things really rebound so that we don't end up in another inventory position like we were at the end of last year.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

109.    On March 3, 2022, Funko filed a Form 10-K announcing financial results for the year ending December 31, 2021, and signed and certified by the Individual Defendants. Included among the "Risk Factors" disclosed in the filing was the following:

Our success depends, in part, on our ability to successfully manage our inventories. We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin.

* * *

If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period.

110.    In its Form 8-K filed the same day, which was signed by Fall Jung, the Company provided detail on the year's SG&A outlook. Fall Jung was quoted as saying, "SG&A as a percent of sales is also expected to be slightly higher in the first half of the year due to the timing of project costs associated with consolidation and relocation of our U.S.-based distribution centers and our ERP implementation."

111.    Also on March 3, 2022, Funko held its 4Q21 earnings call. During the call – Perlmutter's first as CEO of Funko – Perlmutter provided financial guidance for 2022 that exceeded analyst consensus expectations, stating:

For 2022, we anticipate revenue growth of between 20% and 25% and adjusted EPS of $1.75 to $1.91, with adjusted EBITDA margin relatively in line with fiscal 2021, reflecting onetime project spend that Jen will describe in detail as well as freight headwinds that we are now expecting to remain in place for most of the year. Despite external factors that are largely out of our control, we've proven our ability

COMPLAINT - 38

to deliver in difficult environments, and I'm very confident we are well positioned to meet our objectives for the full year.

112.    Also during the call, Fall Jung told analysts and investors: "We expect our adjusted EBITDA margin to be relatively in line with 2021 [14.6%], reflecting a significant freight inflation headwinds as well as approximately 80 basis points of pressure due to onetime product spend from the consolidation and relocation of our distribution centers and our new ERP system."

113.    An analyst from Jefferies asked Fall Jung: "You gave 80 basis points of pressure from – it seems like more of a transitory DC and ERP implementation and transition. Any context on when that 80 basis points is concentrated? Is it first half, second half? Anything we should be mindful of?" Fall Jung replied: "Yes. Yes, first half, for sure. [W]e will probably launch in the beginning[,] early . . . Q3 for the ERP, but the distribution center move will happen in the first half."

114.    The statements detailed above were materially false and misleading when made. As the Individual Defendants knew or recklessly disregarded: (a) contrary to Fall Jung's statements, there was no way that the costs from "consolidation and relocation of our distribution centers and our new ERP system" would be "slightly higher" or limited to "approximately 80 basis points of pressure" that would "for sure" be concentrated in the first half of 2022. Actually, as the Individual Defendants were aware at the time they made these statements, the Buckeye DC was designed to run on Oracle WMS, without which the massive warehouse could not be run efficiently. This software was part of the Oracle integration, which the Individual Defendants knew would not be ready for implementation by summer 2022. Moreover, Funko's lease on the Buckeye warehouse would only start at the beginning of April 2022, and they had not yet built out the necessary rack space, obtained permitting for the needed rack space, hired or trained the requisite additional warehouse workers, or obtained the equipment necessary for the DC to function at even

COMPLAINT - 39

moderate efficiency. This, combined with the sheer amount of inventory that was being transferred from the five Washington warehouses and the amount of inventory that was currently stuck in transit but would be sent to Buckeye when it was released made it a near certainty that costs related to getting the DC operational and productive would extend well beyond 2Q22; (b) contrary to the above statements, it was well-understood inside Funko that the Oracle project was not going to be ready by the end of 2Q22 or beginning of 3Q22. Not only was the C-Suite not aligned on how the ERP system should function, making it impossible for the integration team to complete the system architecture, but more than a year into the Oracle project, Funko's data was still far from being "clean" enough to transfer to a new ERP system, something an employee had voiced to Fall Jung weeks earlier. Meanwhile, the Company's Microsoft NAV system was antiquated and unable to handle the workload of Funko's growing operations reliably. The Company was therefore not "well positioned to meet our objectives for the full year."; and (c) although the Individual Defendants warned of a possible risk of having excess inventory "that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard," that "risk" had already materialized – each of Funko's five Washington warehouses carried a significant amount of dead and aged inventory accumulated over at least two years that the Individual Defendants knew they were not able to sell. In EV1, the Company's largest Washington distribution facility, approximately 25% of the inventory housed was dead.

115. On April 8, 2022, the Company filed its 2022 Proxy Statement with the SEC. Defendants Denson, Kriger, Mariotti, Lunsford, Perlmutter, Brotman, Irvine, and Levy solicited the 2022 Proxy Statement. Among other things, the 2022 Proxy Statement sought shareholder approval for the re-election of Defendants Lunsford and Perlmutter to the Board.

COMPLAINT - 40

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

116.    The 2022 Proxy Statement, in soliciting shareholder votes, contained the following information:

Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management policies and strategy, the most significant risks facing us, including cybersecurity, and oversees the implementation of risk mitigation strategies by management. Our Board of Directors is also apprised of particular risk management matters in connection with its general oversight role, and approval of corporate matters and significant transactions. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

117.    However, this information was materially false and misleading because it failed to disclose to investors that the Board was not adequately exercising its risk oversight function and was not apprised of all risk management matters as the inventory risks had materialized but were not being mitigated or remedied.

118.    The omitted information was material to investors, who were being asked to, *inter alia*, re-elect Defendants Lunsford and Perlmutter to the Board because the omitted information went to the core of the Company's operations and prospects. Thus, had the 2022 Proxy Statement contained this material information, the Company's shareholders likely would have voted against the proposals solicited by Defendants Denson, Kriger, Mariotti, Lunsford, Perlmutter, Brotman, Irvine, and Levy.

119.    However, upon the false and misleading 2022 Proxy Statement, Company shareholders voted to, *inter alia*, re-elect Defendants Lunsford and Perlmutter to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

120.    On May 5, 2022, Funko filed a press release on Form 8-K with the SEC, signed by Fall Jung, announcing its financial results for 1Q22 and reiterating its previously announced FY22 guidance. Specifically: "Adjusted EBITDA margin of approximately 14.6% at the midpoint of our revenue range. This reflects ongoing transocean freight inflation, as well as approximately 80 bps

COMPLAINT - 41

of headwind from one-time project spend associated with the consolidation and relocation of our U.S.-based distribution center and the implementation of our new ERP system." The press release also stated that:

> In the second quarter of 2022, the Company anticipates the following results: . . . SG&A as percent of net sales to increase sequentially, reflecting one-time project spend on our distribution center relocation, and ERP implementation; and [l]ower gross margin and higher SG&A as a percent of sales, which are expected to reduce adjusted EBITDA margin sequentially before recovering in the second half of this year.

121.    In its Form 10-Q for 1Q22 filed the same day, signed and certified by Perlmutter and Fall Jung, Funko included the following "Risk Factor":

> ***Failure to successfully operate our information systems and implement new technology effectively could disrupt our business or reduce our sales or profitability***.
>
> We rely extensively on various information technology systems and software applications, including our enterprise resource planning software, to manage many aspects of our business, including product development, management of our supply chain, sale and delivery of our products, financial reporting and various other processes and transactions. We are critically dependent on the integrity, security and consistent operations of these systems and related back-up systems. . . . The failure of these information systems to perform as designed, our failure to operate them effectively, or a security breach or disruption in operation of our information systems could disrupt our business, require significant capital investments to remediate a problem or subject us to liability. We are also in process of upgrading our enterprise resource planning software globally, beginning in the United States. If the potential upgrades are not successful or result in delays, our business could be disrupted or harmed.

122.    Another "Risk Factor" stated:

> ***Our success depends, in part, on our ability to successfully manage our inventories***.
>
> We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. . . .
>
> If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period.

COMPLAINT - 42

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

123.    Also on May 5, 2022, Funko held its 1Q22 earnings call. During the call, Fall Jung again asserted that:

[W]e remain on track to deliver full year adjusted EBITDA margins consistent with 2021. This target reflects the ongoing freight inflation headwinds as well as approximately 80 basis points of pressure due to onetime project spend from the consolidation and relocation of our distribution centers and the implementation of our ERP system.

124.    Later on the call, Fall Jung had the following exchange with a market analyst from Jefferies:

[Q.:] And then, Jen, one for you is just on your remarks around the onetime project spend for ERP and DC (inaudible) can you just help us think through the total amount that you anticipate spending? And then anything more by cadence by quarter would be really helpful.

[Fall Jung:] Yes. Thanks for the question. So yes, we reported out that was about 80 basis points on the year, all of which will happen in the first half of the year. It's about 2 points of pressure just in Q2 on adjusted EBITDA. So we're launching – or we did launch the new DC in April, and the ERP is set to come out at the end of the quarter.

[Q.:] Okay. So anything trickling into the back half? Or should we assume that it's pretty much done after Q2?

[Fall Jung:] Yes. It's really the pressure[']s all in the first half of the year, specifically Q2.

125.    Answering additional analyst questions regarding Funko's gross margin, Fall Jung again reiterated that the SG&A cost pressure would be focused in 2Q22: "So unfortunately, it's a bit of a hockey stick on the margin front, the way it looks. But Q2 is where we're seeing the pressure from the net SG&A perspective on the investments as well as on pressure from freight."

126.    The statements detailed above were materially false and misleading when made. As the Individual Defendants knew or recklessly disregarded: (a) although the Individual Defendants warned of a possible risk of having excess inventory "that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard," that "risk" had already materialized – each of Funko's five Washington warehouses carried a significant amount

COMPLAINT - 43

of dead and aged inventory accumulated over at least two years that the Individual Defendants knew they were not able to sell – an estimated 25-30% of inventory in the Washington warehouses as of April 2022. Beginning in April, this dead inventory had been transferred to the Buckeye DC, where it was taking up rack and floor space that was at a premium and needed for new (and sellable) products; (b) the statement that "business could be disrupted or harmed" if the ERP system upgrades were "not successful or result in delays," was materially misleading, as that risk had already materialized as well. The Oracle ERP was originally intended to launch at the same time as the Buckeye DC, and the Buckeye DC was designed around the Oracle ERP system. When it was apparent by early 2022 that the ERP would not be ready for implementation by the April opening of the DC, the Company decided to plow forward and open the DC anyway, with disastrous effect. At the time this "risk factor" was issued, the DC was already experiencing problems with inventory not being checked in or out properly and so being lost within the facility and the inventory layout floor plan designed by the Oracle team was inefficient and unusable; (c) the assertion that "failure to successfully operate our information systems and implement new technology effectively could disrupt our business" was also a risk that had already materialized. Its antiquated systems were inadequate to run the Company's operations, including inventory tracking, as CFO/COO Nave later admitted. The data contained within the existing system was incomplete and often inaccurate, requiring Sales and S&OP employees to engage in manual workarounds and disrupting the Oracle integration process. And, by the time that the Individual Defendants published this statement, the Buckeye DC had abandoned using NAV to verify inventory accounts or check inventory into the warehouse due to its inconsistent data, failure to update, and inability to handle the workload that the Buckeye DC needed it to perform. As a result, product was being "lost" in transfer and in the DC, causing problems fulfilling orders; (d) contrary

COMPLAINT - 44

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

to Fall Jung's representation, it was well-understood inside Funko that the Oracle project was not going to be ready by the "end of the quarter [2Q22]." Not only was the C-Suite not aligned on how the ERP system should function, making it impossible for the integration team to complete the system architecture, but more than a year into the Oracle project, Funko's data was still far from being "clean" enough to transfer to a new ERP system, something an employee had voiced to Fall Jung weeks earlier; and (e) contrary to the statements that there was no way that the costs from "consolidation and relocation of our distribution centers and our new ERP system" would be limited to "approximately 80 basis points of pressure[,]" "all of which will happen in the first half of the year." Actually, as the Individual Defendants were aware at the time they made these statements, the Buckeye DC was designed to run on Warehouse Management Software, without which the massive warehouse could not be run efficiently. Because this software was part of the Oracle integration, which the Individual Defendants knew would not be ready for implementation by summer 2022, the Individual Defendants could not reasonably say that costs from the relocation would be limited to the first half of the year. Meanwhile, as discussed above, the Oracle integration was far from being completed. In fact, the entire project would end up being abandoned at a cost of $32.5 million in 4Q22, in part because it was not going to be ready for implementation in summer 2023. More, Funko's lease on the Buckeye warehouse only started at the beginning of April 2022, and they had not yet built out the necessary rack space, obtained permitting for the needed rack space, hired or trained the requisite additional warehouse workers, or obtained the equipment necessary for the DC to function at even moderate efficiency. This, combined with the sheer amount of inventory that was being transferred from the five Washington warehouses and the amount of inventory that was currently stuck in transit but would be sent to Buckeye when it

COMPLAINT - 45

was released made it a near certainty that costs related to getting the DC operational and productive would extend well beyond 2Q22.

127.    On August 4, 2022, Funko filed its Form 10-Q for 2Q22, signed and certified by Perlmutter and Fall Jung. The 10-Q once again included "risk factors" regarding its inventories. Specifically:

> ***Our success depends, in part, on our ability to successfully manage our inventories***.
>
> We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. . . . We have recently experienced canceled orders and if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

128.    Funko's 10-Q also repeated that: "Failure to successfully operate [its] information systems and implement new technology effectively could disrupt our business or reduce [its] sales or profitability," was a "risk factor." Specifically, the Form 10-Q stated:

> We rely extensively on various information technology systems and software applications, including our enterprise resource planning software, to manage many aspects of our business, including product development, management of our supply chain, sale and delivery of our products, financial reporting and various other processes and transactions. . . . The efficient operation and successful growth of our business depends on these information systems, including our ability to operate and upgrade them effectively and to select and implement adequate disaster recovery systems successfully. The failure of these information systems to perform as designed, our failure to operate them effectively, or a security breach or disruption in operation of our information systems could disrupt our business, require significant capital investments to remediate a problem or subject us to liability. We are also in process of upgrading our enterprise resource planning software globally, beginning in the United States. In August 2022, we announced that we are delaying the remaining steps for implementation of our enterprise resource planning software to 2023. If the potential upgrades are not successful or result in further delays, our business could be disrupted or harmed.

COMPLAINT - 46

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

129. The Company's 2Q22 Form 10-Q, also disclosed for the first time that the Company "expect[ed] personnel and related costs to remain elevated through at least the end of 2022 to support the final transitions of our U.S. distribution warehouses, additional personnel to support strategic initiatives and overall business growth and due to additional inflationary pressures to increase wages, commissions and benefits expenses," and "also expect[ed] elevated costs related to our enterprise resource planning ('ERP') implementation as we expect to finalize the remaining steps in early 2023."

130. Perlmutter and Fall Jung also signed and submitted SOX certifications with the 2Q22 Form 10-Q which stated in relevant part that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> * * *

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

131. In its August 4, 2022 Form 8-K, signed by Fall Jung, Funko reported that: "Inventories at the end of the second quarter of 2022 totaled $234.0 million, up 170.9% compared to a year ago, reflecting receipt of delayed inventory as pandemic-related supply chain disruptions began to improve toward the end of the quarter."

COMPLAINT - 47

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

132.    After market close on August 4, 2022, Funko held its 2Q22 earnings call. On the call, Fall Jung misleadingly stated that:

SG&A for the quarter was $83 million or 26% of net sales. In Q2, we saw elevated expenses related to the relocation of our distribution center from Everett to Buckeye, Arizona as well as our ERP project. Regarding our ERP, we recently made the difficult decision to delay the remaining steps until 2023. There were a number of factors that contributed to this decision, but ultimately, we did not want to impair the momentum that we have today by shifting to a platform that we felt wasn't yet fully ready to support our business. We plan to have more details for you around our 2023 implementation plans on our Q3 call in November.

133.    Later, speaking to the Company's bloated inventory levels, Fall Jung stated:

Inventory at quarter end totaled $234 million as shipping delays began to subside. While our inventory levels are up year-over-year, we believe that inventory is generally high quality and leave us well positioned to meet our consumer demand and support our strong second half growth forecast.

134.    In an exchange with a Jefferies analyst, Fall Jung reiterated that the inventory was in a "healthy position":

[Q.:] Jen, the first is on inventory. Just to give you a chance to talk a little bit more about where the inventory resides, how much of it is related to the DC relocation? How much might be in transit? If you could just dimensionalize inventory for us, that would be appreciated.

[Fall Jung:] Great. Yes, inventory, so what we actually ended up, as you know, in Q4, had a lot of delays that rolled into Q1 just due to the congestion within the supply chain. And you're seeing a little bit of that in Q2 as well. Although as we're now looking into the back half of the year, we feel the inventory is in a really good healthy position, and we're poised to deliver on our back half results. It was really about just managing through the congestion that we saw so far. Knowing that, we're seeing those transit times come down and delivery dates to be more on time than they had earlier in the year. So there is a large portion of the in-transit, but we're working to get that into the DC and get that out to our customers.

135.    In a separate exchange with an analyst from D.A. Davidson, Fall Jung was asked about the delayed Oracle implementation and what it meant for SG&A costs:

[Q.:] And also on the cost side, you've talked about pushing out this ERP initiative into 2023. Does that mean there's going to be less associated SG&A costs associated with that in 2022?

[Fall Jung:] No, and that's actually a great question. There'll be puts and takes about 2022. We will still continue to work on these initiatives throughout the year. So the run rate will continue. But there's other offsetting factors to that. So we don't see

COMPLAINT - 48

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

it as a major headwind in 2022 so far, but we feel good we made the right decision for the business to not have business interruption as we go into the holiday season.

136.    Asked whether "in 2022, do you have any sense for whether like your cash flow can be up or down year-over-year[,]" Fall Jung misleadingly replied:

What you're seeing underneath the covers there [are] a couple high [uses] of cash, whether it be the distribution center, that was a major feat to get that up and running . . . then we had the inventory that came in all at once as you got in Q4 inventory, Q1 inventory. And so (inaudible) inventory and some of the uses of cash is what you're seeing.

137.    The statements detailed above were materially false and misleading when made. As the Individual Defendants knew or recklessly disregarded: (a) contrary to the Individual Defendants' warning of a possible risk of having excess inventory "that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard," that "risk" had already materialized – each of Funko's five Washington warehouses carried a significant amount of dead and aged inventory accumulated over at least two years that the Individual Defendants knew they were not able to sell – an estimated 25-30% of inventory in the Washington warehouses as of April 2022. This dead inventory had been transferred to the Buckeye DC, where it was taking up rack and floor space that was at a premium and needed for new (and sellable) products. Moreover, as hundreds of shipping containers of inventory delayed since as long ago as 4Q22 (approximately 10 months earlier) sat in Funko's parking lot unable to be unloaded due to the inventory congestion at the DC, the amount of aging, unsellable and dead inventory Funko further accumulated. Fall Jung's statements attributing the increase in Funko's inventory solely to "receipt of delayed inventory" or suggesting inventory was "in a healthy position" and "generally high quality" omitted or misrepresented these material facts; (b) the statement that "business could be disrupted or harmed" if the ERP system upgrades were "not successful or result in delays," was materially misleading, as that risk had already materialized as well. The Oracle ERP was originally

COMPLAINT - 49

BADGLEY MULLINS TURNER PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

intended to launch at the same time as the Buckeye DC, and the Buckeye DC was designed around the Oracle ERP system. When it was apparent by early 2022 that the ERP would not be ready for implementation by the April opening of the DC, the Company decided to plow forward and open the DC anyway, with disastrous effect. At the time this "risk factor" was issued, the lack of WMS at the Buckeye DC was wreaking havoc, with inventory not being checked in or out properly and so being lost within the facility, and Pickers unable to find product needed for orders within the facility, such that partially collected orders littered the warehouse floor. By August 2022, the DC was more than 50 days behind in shipping customer orders; (c) Funko's assertion that "failure to successfully operate our information systems and implement new technology effectively could disrupt our business" was also a risk that had already materialized. Its antiquated ERP was inadequate to run the Company's operations, as CFO/COO Nave later admitted. The data contained within the existing system was incomplete and often inaccurate, requiring Sales and S&OP employees to engage in manual workarounds and disrupting the Oracle integration process. And, by the time that the Individual Defendants published this statement, the Buckeye DC had abandoned using NAV to verify inventory accounts or check inventory into the warehouse due to its inconsistent data, failure to update, and inability to handle the workload that the Buckeye DC needed it to perform. As a result, product was being "lost" in transfer and in the DC, causing problems fulfilling orders; (d) contrary to Funko's statement that the Company expected elevated costs through the end of 2022 in order to "support the final transitions" of its distribution facilities and to "finaliz[e]" the Oracle ERP system, Funko actually expected those elevated costs because the Buckeye DC was in chaos, with 300 to 500 rented shipping containers accruing extremely high rental fees and late charges as they sat unloaded in Funko's Buckeye parking lot. Moreover, because the DC did not have the WMS it was designed to run on or the equipment that workers

COMPLAINT - 50

needed to efficiently fulfill orders, Funko had needed to hired additional manpower to get the DC up to even a minimal level of productivity; (e) contrary to Perlmutter's and Fall Jung's SOX certifications, the Company had undisclosed material weaknesses in its internal control over financial reporting, particularly with respect to the Company's General Information Technology Controls ("GITCs"), as it would soon admit in its 3Q22 Form 10-Q. Specifically, the Company had ineffectively designed and implemented user access controls and segregation of duties controls within information technology systems utilized by the Company in its financial reporting. This was certainly the case in the Microsoft NAV system, where new hires' NAV credentials were created by simply mirroring the user permissions of other employees without the imposition of any controls to limit their specific access to modify existing entries. This was a major problem, as it allowed any warehouse employee to change inventory counts and other critical information that the Company's financials depended upon, potentially undermining the reliability or accuracy of their SEC reporting; (f) Fall Jung's assertions that the ERP implementation had been pushed to 2023 because "ultimately, we did not want to impair the momentum that we have today" and in order to "not have business interruption as we go into the holiday season" blatantly ignored the ongoing chaos at the Buckeye DC. Far from experiencing "momentum," the Company's distribution capabilities had been crippled by the lack of WMS in the Buckeye DC, and the facility was completely overrun with inventory that had been stored haphazardly and was unable to be located, as well as pallets of partial orders that could not be completed until missing inventory was located. There were hundreds of unloaded shipping containers that contained inventory that could not be placed in the DC, and so did not register as "in-stock" for order fulfillment. The Company was more than 50 days behind in fulfilling orders by the end of 2Q22, and at least some retail orders had been decreased or cancelled altogether due to the delays. More, the ERP implementation

COMPLAINT - 51

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

was not pushed in order to avoid interrupting the holidays; the system had never been ready to implement in 2Q22, and in fact, would ultimately end up being abandoned at a cost of $33 million in 4Q22, in part because it was not going to be ready for implementation in summer 2023; (g) Contrary to Fall Jung's claim that SG&A spend due to the delayed ERP implementation would not pose "a major headwind in 2022" omitted the ongoing costs of operating the Buckeye DC without the WMS software it was designed around, and which had already cost the Company millions in additional labor and cancelled orders; (h) Fall Jung's statement that the Company had spent significant cash on the Buckeye DC, which "was a major feat to get that up and running" misleadingly implied that the cash spent had been sufficient to get the Buckeye DC up and running. In reality it was barely functional, well over capacity with hundreds of shipping containers unable to be unloaded, and would require significantly more SG&A spend in future quarters to obtain the necessary equipment, labor, and space for the warehouse to actually be efficiently functional; and (i) Fall Jung's statement that a large portion of the Company's inventory was "in-transit, but we're working to get that into the DC and get that out to our customers" concealed the true state of Funko's inventory management: the problem was no longer that inventory was stuck in port due to COVID 19-related delays, nor was inventory "congestion" a problem of the past. Instead, by July 2022, hundreds of the "in-transit" containers of inventory had actually arrived at Funko's Buckeye DC, but were simply sitting in the parking lot, continuing to accrue rental fees because there was nowhere for workers to unload the inventory. The inventory was only considered "in-transit" because it couldn't be physically placed in the warehouse; without being unloaded, that inventory could not be considered "in-stock" or be able to be shipped to customers.

138.    On September 13, 2022, Funko held its first ever Press and Investor Day. Speaking to what would allow Funko to achieve the strategic plan presented, Perlmutter misleadingly stated:

COMPLAINT - 52

And then last, but certainly not least, is the unlock of technology to help us get where we're going faster and better. And that's some of the investments that we've made this year, and that we're always keeping a look at, keeping our eye on. What are the next investments we need to do to ensure our success and ensure this growth.

139.    Later in the call, a participant asked: "SG&A as a percentage of revenue has increased a bit over the past few years. How does that trend reverse? And what's the biggest source of operating leverage for you?" Fall Jung responded:

Yes. What you saw for the first half of the year so far in this year is really the investments that we've made in the ERP as well as in the distribution center. So we've been making investments for the future, and those have been coming in on the P&L. But as we look forward, we did talk about operating leverage to get to our adjusted EBITDA margin of 20%. We feel we have a good path to get there.

140.    Another participant asked: "Can you help us quantify how much investment is needed for that internal growth, or how much internal investment is needed for the growth?" Fall Jung answered:

For the most part, from a capital perspective, we have been pretty – I think you're talking about the core business growth. We've been pretty diligent about our capital. It has really been to support our tools and molds and to continue to expand our product categories. Obviously, down the road, we'll eventually need probably more distribution capabilities to continue support the growth, but that's more of a future down the road within the 5-year plan, but not directly related within the next, call it, 12 months or so.

141.    The statements detailed above were materially false and misleading when made. As the Individual Defendants knew or recklessly disregarded: (a) contrary to Perlmutter's statements, Funko's investments in technology during 2022 had not "help[ed it] get where we're going faster and better." If anything, the decision to delay the Oracle implementation had decreased Funko's operational capabilities and crippled the Buckeye DC's ability to fulfill and distribute orders in a timely or efficient manner; (b) Fall Jung's statement that "[w]hat you saw for the first half of the year so far in this year is really the investments that we've made in the ERP as well as in the distribution center[,]" falsely implied that the SG&A spend in the ERP and distribution center would not continue weighing on adjusted EBITDA margin in the future. Actually, the

COMPLAINT - 53

Individual Defendants knew that it would take far more SG&A spend then had already been undertaken to resolve the problems with the Oracle ERP project and the foundering Buckeye DC, which was more than 50 days behind in shipping customer orders; and (c) far from being set for distribution capabilities for the next 12 months as Fall Jung's statement asserted, the Buckeye DC was already way past its intended capacity, and hundreds of shipping containers were parked in the DC lot just waiting to be unloaded into the overfilled warehouse. In fact, within two weeks of Fall Jung making this statement, Funko would rent a third-party warehouse to store its aging and dead inventory, and a few weeks after that, would be forced to rent a second.

142.    On November 3, 2022, Funko filed its 3Q22 Form 10-Q, signed and certified by Perlmutter and Fall Jung. The 10-Q contained the following materially misleading "risk factor":

> ***Our success depends, in part, on our ability to successfully manage our inventories***.
>
> We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. . . . We have recently experienced canceled orders and if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

143.    Speaking on the Company's 3Q22 earnings call later that day, Fall Jung stated that:

> Inventory at quarter end totaled $266 million. Inventory levels remain higher than the prior year, which was a particularly tight inventory environment due to port delays and supply chain congestion. We believe that our inventory is generally high quality, we will continue to work through our inventory levels and expect to make sequential progress.

144.    Later, an analyst from J.P. Morgan asked: "I guess, given where your inventory levels are . . . are you – do you think you're going to have to take any actions on any of your owned

COMPLAINT - 54

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

inventory – and how does that change how you're thinking about – or does it change how you're thinking about growing the top line double digit?" Fall Jung answered:

> As we think about our inventory, yes, it is up year-over-year. Remember, last year was a pretty tight inventory environment because we were dealing with the supply chain challenges. So there is a little bit of nuance in the number underneath the covers. That being said, we are constantly looking at the quality of our inventory, and we think it generally is very healthy right now. And in the event where we have seen a pullback a little bit in Q4, we have been making the right edits to our inventory, whether it be cutting receipts or pushing receipts out to make sure that we are managing this and managing it down towards the end of the year. Definitely an area to focus thrust.

145.    The statements detailed above were materially false and misleading when made. As the Individual Defendants knew or recklessly disregarded: (a) although the Individual Defendants warned of a possible risk of having excess inventory "that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard," that "risk" had already materialized – each of Funko's five Washington warehouses carried a significant amount of dead and aged inventory accumulated over at least two years that the Individual Defendants knew they were not able to sell – an estimated 25%-30% of inventory in the Washington warehouses as of April 2022. This dead inventory had been transferred to the Buckeye DC, where it was taking up rack and floor space that was at a premium and needed for new (and sellable) products. More, as hundreds of shipping containers of inventory delayed since as long ago as 4Q22 (approximately 10 months earlier) sat in Funko's parking lot unable to be unloaded due to the inventory congestion at the DC, the amount of aging, unsellable and dead inventory Funko further accumulated; (b) similarly, Funko's statement "if we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected," was also misleading, as the Company's failure to manage its inventory had resulted in hundreds of shipping containers sitting, unloaded, in the DC parking lot for months. Not only was inventory becoming dead due to expired licenses and missed windows of relevance (resulting in lack of demand), but

COMPLAINT - 55

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

retailers had also cancelled large orders for seasonal-themed inventory that wouldn't arrive by the intended holiday. For example, when one Account Manager asked for a large retail order of Valentine's Day inventory to be shipped by October at the latest, they were told that the earliest the warehouse could get to it was May 2023, seven months later – and unsurprisingly, the customer cancelled the order. Meanwhile, Funko employees would be unloading trailers of Christmas-related inventory well into spring of 2023. Further, Funko's financial results, including its gross margin, had also been impacted by the expensive late fees and rental charges owed on the hundreds of shipping containers sitting in the lot, which came at a time when freight rates were exceptionally high; and (c) contrary to the statements, a significant portion of Funko's inventory was not "high quality" or "very healthy," nor had Funko been "making the right edits" to its inventory. Rather, not only was there two years' worth of dead inventory that had been shipped to Buckeye from Funko's Washington warehouses clogging up Buckeye's shelves, but the shipping containers that had arrived following delays since 4Q21 and 1Q22 contained aging product that was no longer in demand or was out of license and unable to be sold. The fact was that rather than destroy the dead and unsellable inventory, Funko had chosen to rent two additional third-party warehouses in 3Q22 and 4Q22, amounting to 300,000-400,000 square feet of storage space, to continue holding the slow-moving and dead inventory. Ultimately, within just a few months, Funko would announce the need to write-down more than $30 million of inventory – tens of millions of units of product and more than twice the amount of Funko's disastrous 2019 write-down.

## DAMAGE TO THE COMPANY

**Securities Class Action**

146.    On June 2, 2023, a securities class action complaint was filed in the United States District Court for the Western District of Washington against the Company and Defendants

COMPLAINT - 56

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Perlmutter and Jung. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Construction Laborers Pension Trust of Greater St. Louis, et al. v. Funko, Inc., et al.*, Case No. 2:23-cv-00824-JLR (W.D. Wash.) (the "Securities Class Action").

147. In February 2026, the Court of Appeals for the Ninth Circuit reversed in part the Western District of Washington's order granting the defendants' motion to dismiss and remanded the case for further proceedings. In doing so, the Ninth Circuit held "it would be absurd to believe that CEO Perlmutter and CFO Fall Jung did not know that their statements related to Funko's inventory and information technology system were misleading at the time that they were made."

148. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers through substantive litigation. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

149. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

150. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed

COMPLAINT - 57

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

151.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Departure of Executive Officers**

152.    Following the wrongdoing, a number of the Company's executive officers – including Defendants Mariotti, Perlmutter, and Fall Jung – have departed the Company.

153.    These executives held high-ranking roles within Funko, and filling these roles will have required the Company to expend significant amounts. As is commonly reported, the cost of replacing C-suite executives can be costly for a company.[1]  Thus, the Company having to replace these executive officers following the wrongful conduct will undoubtedly have cost the Company substantial amounts.

**Additional Damage to the Company**

154.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

155.    The Company will also suffer losses in relation to the Individual Defendants'

---

[1]    *See e.g.*, *The Quiet (and Expensive) Cost of Poor C-Suite Retention*, Stanton Chase (Aug. 2022), https://www.stantonchase.com/insights/white-papers/the-quiet-and-expensive-cost-of-poor-c-suite-retention-2; *CEO Selection: The Costs of Getting it Wrong*, Spencer Stuart (May 2016), https://www.spencerstuart.com/research-and-insight/ceo-selection---the-costs-of-getting-it-wrong; *How Much Does Replacing an Employee Cost?*, BOS (2019), https://www.bos.com/inspired/how-much-does-replacing-an-employee-cost/.

COMPLAINT - 58

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

156.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

157.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

158.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

159.    At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which "applies to all of our directors, officers and other employees."

160.    In a section entitled "Company Records," the Code of Conduct states:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology, products and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

COMPLAINT - 59

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's General Counsel to obtain a copy of any such policy or with any questions concerning any such policy.

161.    In a section entitled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct states:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

162.    In a section entitled "Compliance with Laws and Regulations," the Code of Conduct states:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

***

Public Communications and Regulation FD

Public Communications Generally

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to

COMPLAINT - 60

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Regarding Communications with Analysts, Securityholders and Others to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

### Compliance with Regulation FD

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company to analysts, institutional investors or representatives of the media.

For more information on the Company's policies and procedures regarding public communications and compliance with Regulation FD, please contact the Company's General Counsel for a copy of the Company's Policy Regarding Communications with Analysts, Securityholders and Others or with any questions you may have about disclosure matters.

**Audit Committee Charter**

163.    At all relevant times, the Company had in place its Audit Committee Chater which set forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter provides that "[t]he purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Funko, Inc. (the "Company") is to, among other things, oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

164.    Among other things, the Audit Committee Charter sets forth the following specific duties and responsibilities of the committee:

COMPLAINT - 61

*Annual Financial Statements and Annual Audit*

4. Audit Problems. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

5. Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

6. Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

7. Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management, the Controller and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

8. Review of Earnings Releases. The Committee should discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

9. Review of Quarterly Inventory Report. The Committee must review with management a quarterly inventory report prepared by management.

10. Risk Assessment and Risk Management. The Committee must discuss the Company's policies with respect to risk assessment and risk management and oversee the management of the Company's financial risks and information technology risks, including cybersecurity and data privacy risks. The Committee must discuss with management the steps management has taken to monitor and control these risks.

## DUTIES OF THE DIRECTOR DEFENDANTS

165.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

166.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence

COMPLAINT - 62

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
**TEL** 206.621.6566
**FAX** 206.621.9686

of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

167. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

168. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

169. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so

COMPLAINT - 63

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

170.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless

COMPLAINT - 64

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

171. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

172. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

173. Plaintiffs are current stockholders of Funko and have owned Funko stock at all relevant times hereto. Plaintiffs understand their obligation to hold Funko stock throughout the pendency of this action and are prepared to do so.

174. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

175. Following the alleged misconduct and damage, on February 2, 2026, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it. Attached hereto as Exhibit A, respectively, is a true and correct copy of the Demand.

176. Following this, on February 17, 2026, counsel for Funko wrote to Plaintiffs'

COMPLAINT - 65

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

counsel by email noting that "Funko's board of directors has meetings in the coming weeks. We expect to have a response to your client's letter shortly after those meetings conclude."

177.    Promptly thereafter, on February 20, 2026, counsel for Plaintiffs asked Funko's counsel for (i) a timeframe regarding Funko's forthcoming meetings and response to the Demand; and (ii) whether Funko had obtained tolling agreements with the Individual Defendants in light of a forthcoming statute of limitations period. Plaintiffs' counsel, having received no response, sent a follow-up to Funko's counsel on February 26, 2026. To date, Plaintiffs have not received any further response, and the Board's inaction has left the Company's valuable claims to expire. A true and correct copy of the email exchange between Funko's counsel and Plaintiffs' counsel is attached as Exhibit B hereto.

178.    The Board has been on notice of the wrongdoing alleged herein since at least the commencement of the Securities Class Action, filed in June 2023, if not from the beginning of the wrongdoing alleged herein. As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk, which the Board have been further made aware of as a result of the Ninth Circuit's reversal of the motion to dismiss and its findings regarding scienter and falsity. However, to date, the Board has failed to take any action on behalf of the Company.

179.    Because the Individual Defendants plausibly knew about the inventory issues and false and misleading statements, as noted by the Ninth Circuit, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the

COMPLAINT - 66

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

Company will suffer additional damage as it moves forward with defective internal controls and burdened with the financial harms caused to it.

180.    In addition, the Board's inaction would have subjected the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. The Board was plausibly aware of the forthcoming statute of limitations because: (i) they have known about the alleged wrongdoing, including when the truth emerged, since the inception of the Securities Class Action; (ii) Plaintiffs raised the issue with Funko's counsel; and (iii) courts have noted that not being aware of the statute of limitations could demonstrate a lack of business judgment. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.[2]

181.    Furthermore, any delay in taking action carries the risk that as time progresses, evidence becomes stale, memories dim, and the ability to adequately investigate and/or prove the allegations herein will become more burdensome, particularly given the risks of potential destruction of documents and electronic data (whether intentional or inadvertent), dissipation of the Company's assets, fading memories, and increased geographical dispersion of percipient witnesses. Thus, the Board's lengthy and continued inaction here does not serve the interests of the Company in being able to adequately investigate and/or bring the claims that belong to it.

182.    Accordingly, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered

---

[2]    It is also plausible that the Board, aware that the statute of limitations period would soon expire, are ignoring Plaintiffs' demand so they will not have to investigate and commence an action against themselves for the alleged wrongdoing. Such action would most certainly not be in the Company's best interests, nor would it constitute a good faith exercise of the Board's business judgment.

COMPLAINT - 67

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiffs have satisfied the demand requirements and may pursue this action to procure a judgment in Funko's favor and should be permitted to proceed with this derivative action.

## CLAIMS FOR RELIEF

## COUNT ONE

## (Against the Individual Defendants for Breach of Fiduciary Duties)

183.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

184.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

185.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry and good faith.

186.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187.    In breach of their fiduciary duties owed to Funko, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact concerning Funko's abysmal execution of two highly touted infrastructure projects and its accumulation of excess and obsolete inventory.

188.    As a direct and proximate result of the Individual Defendants' breach of their

COMPLAINT - 68

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT TWO

### (Against the Individual Defendants for Gross Mismanagement)

189. Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

190. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

191. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

192. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE

### (Against the Individual Defendants for Waste of Corporate Assets)

193. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

194. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and

COMPLAINT - 69

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

ongoing harm to the Company.

195.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions.

196.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

### COUNT FOUR

### (Against the Individual Defendants for Unjust Enrichment)

197.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

199.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

200.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation,

COMPLAINT - 70

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT FIVE

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

201.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

202.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

203.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

204.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

205.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy Statement filed with the SEC.

COMPLAINT - 71

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

206.    The 2022 Proxy Statement was used to solicit shareholder votes in connection with the re-election of certain to the Board, among other things.

207.    The 2022 Proxy Statement was materially false and misleading because they each concealed from investors that, despite representations to the contrary, the Board was not adequately exercising its risk oversight function and was not apprised of all risk management matters as the inventory risks had materialized but were not being mitigated or remedied.

208.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading.

209.    The materially false and misleading statements contained in the 2022 Proxy Statement misleadingly induced shareholders to vote in favor of, among other things, the re-election of certain Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

210.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties, gross mismanagement, unjust enrichment, and waste of corporate assets;

COMPLAINT - 72

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566
FAX 206.621.9686

C.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: March 2, 2026                    Respectfully submitted,

**BADGLEY MULLINS TURNER PLLC**

*/s/ Duncan C. Turner*
Duncan C. Turner, WSBA No. 20597
Mark Trivett, WSBA No. 46375
19910 50th Avenue W., Suite 103
Lynnwood, WA 98036
Tel: (206) 621-6566
Email: dturner@badgleymullins.com
Email: mtrivett@badgleymullins.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (pro hac forthcoming)
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016

COMPLAINT - 73

Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com
***Attorneys for Plaintiff***

COMPLAINT - 74

# ATTACHMENT

# Verification(s)

**VERIFICATION**

I, FRANCO CASELLA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Funko, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Funko, Inc. common stock at all relevant times.

_____
FRANCO CASELLA

## VERIFICATION

I, DEAN MARCONI, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Funko, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Funko, Inc. common stock at all relevant times.

DEAN MARCONI